Good morning. I'm Nicholas Aceto, and I represent Charles Ryan and Richard Pratt, the defendants in these three consolidated appeals. I'll spend my initial time discussing the defendants' two appeals, and then I'll reserve ten minutes for responding to plaintiffs' appeal and rebuttal argument for our two appeals. First, the outside transport order. The crux of our argument is this. The District Court ordered ADC to maintain 100 percent compliance with respect to several performance measures. It defended that order by claiming the stipulation already required 100 percent compliance, but it doesn't. The stipulation only requires ADC to meet a certain threshold. At the time of this dispute, that threshold was 80 percent compliance. Where does it say that? Paragraph 10A of the stipulation. But doesn't that, okay, if obviously there's, because it's a stipulation, there's certain things that if the other side finds you to be in violation, that they have to give you notice and then you have to go through meet and confer and all things. So it's kind of a mechanism so that every time there's something that goes on, that you can't just run to court. But I find it a little bit hard to believe that you want us to say that you only have to take care of 80 percent of the people? Well, that's not what we're saying. Well, I mean, because, you know, once people go into custody, then they're your charge. And there's something, you know, how you take care of those people may be an instance. But to ask to say, well, we don't have to take care of everyone, that doesn't seem very palatable or very, a very logical conclusion. That isn't palatable or logical, but that's not our position. Of course, we should strive for 100 percent compliance. But the stipulation, to be held noncompliant, we have to fall below 80 percent. And that's the distinction, and that's where the district court erred. It instead ruled that we can be held noncompliant if we're below 100 percent compliance, and then in invoking its remedial authority, it tacked on an additional 20 percent of compliance. So we do have to the performance measures require or they explain the conduct. This is what we do. Is it possible to look at what the district court said is, yes, you have to take care of 100 percent, but in order for them to bring you to court, it has to be below the 80 percent. I think what the district court did more than that. We were below the compliance threshold, and what it did was it ruled that we have to ensure that every single inmate is seen in the matter outlined by the performance measures. And that's what the error is. It doesn't require 100 percent compliance, and that's not to say, again, that we are only permitted to take care of 80 percent of the inmates. The distinction is, once we fall below the 80 percent threshold, that, yes, that does trigger the party. Coming to court. I'm sorry? It triggers, they can start bringing you to court. That's right. But the remedy is just to get us back to 80 percent, not to exceed that 80 percent threshold. That's hard to read in there. I mean, it seems to me that it's 100 percent compliance, but the remedial powers of the court don't kick in until the specified levels are reached. I mean, that's the way the district court interpreted it. That's correct, but we think that's wrong. Paragraph 10, it, the purpose of paragraph 10 is twofold. First, it specifically says it determines whether ADC is complied with a particular performance measure. And then it also dictates when defendants can move to terminate. The mechanism to go to court, that's later on. That's in paragraphs 30 and 31, and it does refer to substantial noncompliance. But if you go back to paragraph 10, which, again, defines compliance as being meeting or exceeding the 80 percent threshold, that's where we're at here. And I don't disagree that if we fall below 80 percent, then, yes, we can go to court and the court can resolve the issue. But what the court can't do is say, I'm going to order 100 percent compliance going forward by using all available community resources. You have separate appeals here. Which appeal are you on now? This is the first one. This is our appeal of the O2? Would this be the outside provider's appeal? That's correct. That's correct. That begins with number 16, 16 dash. And ends in 82. Yeah. 16 dash 17282. That's correct. So what do you want to talk about next? Well, I'll stick with this appeal, but I'll jump to the district court. Go ahead. The transportation, public safety, or do you want to? Sure. Yeah. That was another error. I mean, even assuming that there was a the stipulation requires 100 percent compliance, the district court was wrong to then order ADC, as part of its order, to transport these individuals outside of the facility to receive care within an hour or a day of missing the deadline. That order poses a grave danger to inmate staff and the public, and it's frankly just not logistically possible. And when a court is fashioning injunctions, they're supposed to be narrowly tailored, and they're supposed to defer to the expert judgment of corrections officials. And that wasn't done here. The to show the district court with testimony, an expert testimony, the ramifications of this order. And its justification was that, look, I've got to look at the risk of harm to these inmates in the institution and balance that against the risk to public safety. It concluded, after balancing that, that the risk to the inmates outweighed the risk of public harm, but that was an abuse of discretion. We're only talking about noncompliance with certain performance measures. We're not talking about a violation of anyone's constitutional rights. There's never been a finding that any inmate's constitutional rights have been violated. We're talking about a handful of performance measures that fell below the threshold. And to conclude from that, to say that that risk of harm, not actual harm, but that risk of harm, that noncompliance outweighs the risk to public safety by transporting inmates on an hourly basis, on a daily basis, into the communities was an abuse of discretion. Finally, the last issue in this appeal I'd like to touch upon is the court's certification of the transport order. And if you look in its order denying our Rule 60 motion, it did rubber stamp, it did include the language in the PLRA, 3626A1, that its relief was narrowly tailored, narrowly drawn, it extended no further than necessary to correct a constitutional violation, and was the least intrusive means to correct a constitutional violation. But nowhere before that time or even in that order did it actually find that ADC had violated anyone's constitutional rights or any Federal right. A court can only, not only can it not certify an order with that language, but it can't fashion injunctive relief under the PLRA without first making that prerequisite finding. Plaintiffs agree with that. And that was not done here. What plaintiffs argue is that you can somehow infer that there was a constitutional violation by the simple fact that the parties entered into the stipulation. But nowhere in the stipulation did the parties admit that there was a finding of constitutional liability. And in the order regarding settlement, the court never found that there was, in fact, a constitutional violation. Again, it just lifted the language from the PLRA and just put it into an order. But there was no prerequisite finding, and that's an alternative basis to vacate the orders. I'll jump ahead to Appeal Number 3. I can talk about jurisdiction if the Court would like to. I know plaintiffs have argued that there is no jurisdiction, but we've laid three grounds for jurisdiction under 1291, 1292, and also under the Collateral Order Doctrine. In addition to the arguments in our brief, I'd point to the Court to Armstrong v. Schwarzenegger, which plaintiffs have cited in support of jurisdiction for their appeal. That case also supports this Court's jurisdiction here. The order expanding the subclass to include maximum custody inmates and requiring ADC to apply the performance measures to closed custody inmates, that's more than just an interpretive order. It affirmatively required ADC to do something, and that's what makes this case different from cases like Jeff D. It was not simply an interpretive order. It was an affirmative order for ADC to begin to monitor closed custody inmates and ensure that their conditions... Okay. If you're doing an interpretation, you look at the stipulation, right? That's right. And the stipulation says who's included, maximum security or people in certain facilities? Well, this... What is the language that would be, if it's an interpretation, what is the language we're interpreting? There's two things to interpret. One, it defines what the subclass is, and it defines that as including all inmates who are confined for at least 22 hours. Then, the rest of the stipulation, it only mentions the subclass twice. It defines it, and it says that plaintiffs are entitled to five medical and institutional files monthly or when they request it. That's it. The remaining part of the stipulation only talks in terms of max custody inmates. It specifically says that the performance measures apply to max custody inmates, that the protocols apply to max custody inmates. The source documents all derive from max custody inmates. That's the second interpretation. Nowhere else in the stipulation does it say that ADC is supposed to monitor compliance with closed custody inmates, and those are two separate classifications. That classification predated the stipulation. There was always max custody inmates, closed custody inmates, medium custody, and minimum custody. That predated the stipulation. By definition, closed custody inmates are not confined for at least 22 hours a day. They're confined for less than 22 hours a day, and that's all that matters, and that's where the interpretation was wrong. The district court ruled that even though they may be confined for less than 22 hours a day, their conditions are not substantially different enough for me to exclude them from the subclass. Well, again, the definition is clear. It provides a bright line test, and that is the number of hours in confinement. It doesn't say the subclass includes inmates who are confined for 22 hours or more a day or inmates in substantially similar conditions, and that's the misinterpretation, and that's how the district court improperly rewrote the statute. I know nine minutes, too, on reserve. I would. Thank you. Good morning, Your Honors. Donald Spector from the Prison Law Office, appearing for the first time. I'm going to read a passage that we just made. At excerpts of Record 439, there's an order ray settlement, which was signed by the judge on the same day that the settlement was approved by him. It says, based on the entire record in this case and the party stipulation, and I wanted to go to that stipulation, which is on paragraph 36 of the stipulation. It says, based on the entire record, the party stipulate and jointly request that the court find that this stipulation satisfies the requirements of 18 U.S.C. 3626a. And then the court thereby quotes the language of 3626a, and it says, the court hereby finds that the relief set forth is narrowly drawn, extends no further than necessary to correct the violations of the federal rights of the plaintiffs. So there clearly has been a finding and it had been requested by the defendants as well as the plaintiffs that there were constitutional violations in this case, and that's what animates the court's jurisdiction in this matter. I wanted to also respond. You've got two parties coming together and they enter into a stipulated agreement. Why isn't that sufficient? For what, Your Honor? For all this argument about Constitution, the raising of constitutionality, you all agreed to a certain way. I'm just curious why we're arguing on that particular point. I was just responding to my point. I understand. The PLRA requires that there be a constitutional violation in order for the court to have, the federal court, district court, to have authority to enforce it. So that's why this language is in there. That's why the finding was made, and that's, the finding was based on voluminous record, which you've pointed out in our briefs. Okay. Yeah, I understand that. But you can't just agree among the two parties as to what's to happen? Yes, we did that, Your Honor, and we also agreed the court would retain jurisdiction to enforce this stipulation. That's correct. I just want to respond to the defendant's argument about the security risk. First of all, there's been no stay of this order. The defendants didn't even file a stay of this in this court. And as far as the record shows in this case, the defendant, Pratt, testified that no patient has been taken off site pursuant to this order. They may have used community resources. We don't really know. But that order has been in effect now for almost a year, and there have been no problems. There's not even been a motion for modification. One would think if there were, that defendants would have been in court asking for modification. Well, that's the parade of horribles. I know that. But that being said, does that really answer the question for us of whether the court could do it at the time that the court did it? Well, yes, I think. The fact that it hasn't been, it hasn't really been that bad for them? Yeah, I think that, well, I think it's something you should certainly take into consideration. If it was a parade of horribles as they allege in their brief, then you would think something bad would have happened by now. But just to give you some context from where the district court was coming from, you know, there was I guess I look at this a little bit differently. I look at that we're interpreting the stipulation and what the court can do, you know, with the stipulation. So what's happened subsequently, it's always interesting, but Certainly. I understand. But I would like to give you some context about why the court And that was because there are massive and sustained failures on the part of the defendants to meet the critical compliance performance measures that are required by the stipulation. The record, for example, shows a 30 percent vacancy rate for physicians, a 59 percent vacancy rate for psychologists, a 50 percent vacancy rate for medical directors, which describe defendants' efforts at obtaining compliance as, quote, just treading water, backsliding, a chilling amount of failures, and there is a, quote, great chasm of competence in the way the defendants were managing the system. This was after the court had, on numerous occasions, given the state, well, ordered the state to come up with its own plan to fix the problems, found that the defendants were not fixing the problems through their own plans, found that the plans themselves were inadequate, so the district court was trying its best to make sure that the plaintiff class was covered by the performance measures, and it believed that they could use community resources in a safe and secure way. The order allows defendants complete control. They don't have to take people out. They can bring people in. They can use telemedicine. They could hire more nurses or nurse practitioners to do the job. I'd like to go to the other appeal, the second one. Staffing appeal? The staffing appeal, yes. Unless the court has a question about jurisdiction, I'd just like to move right to the merits. We believe that the district court found on several occasions that inadequate staffing is the root cause of the noncompliance. As I just said, the court has given defendants multiple, multiple opportunities to comply without an order aimed directly at staffing. Well, I guess what I'm looking at here is that a court's in a different position if it's hearing, if it's just hearing a case, that you sue the State and you say that there's all these things going on, and then the court orders what you have to do. Correct. Here the court is interpreting the stipulation. And so isn't that, isn't the court in a different situation in doing that? I mean, the fact that they're, say they're getting Fs and everything, if let's just assume that, and it were, and the court were deciding what am I going to order them to do, then the court would have the authority to order what was appropriate. But here we have to look at what, but we have a stipulation. Right. And they settled this. You all agreed to this. Yes. And if it says that you can't force us to hire anyone, what do we do with that? Even though that might answer a lot of the problems. Yes. And I agree. Well, there, there are one answer and one thing about what you can do, what you can do about it. I'm just saying I, I, you can feel badly about that, you know, that, but we have to confine ourselves to the stipulation. So I need to hear that. Sure. And our Not that they're doing a terrible job. Are they, how are they violating the stipulation? Sure. We believe that the court made an error of law in interpreting the stipulation. The stipulation does not say that the court cannot, does not have the power to hire anybody or to force the defendants to hire anybody. The stipulation says that the court has plenary authority to enforce the terms of the stipulation, except it can't order the defendants to build to hire, to hire a specific type and number of staff. Our position is, and I think the plain language of the stipulation is, that the court can order defendants to increase their staffing, leaving to the defendant's discretion the specific type and number of staff that they are to hire. Why do you need to go that far? It seemed to me that, that it would be, that the district court could ask for the, for the prison to indicate what its capacity is necessary. Yes. That would be sufficient under, under your understanding of the, of the agreement. Why do, why do you have to get into the hiring? Why not just the planning phase? Why not just a, a plan for a hiring, for a... A plan of, you know, what, what number of employees would be appropriate? I completely agree, Your Honor. That's what we've been asking the district court to do for two and a half years, and I think... I understand, but you seem to go further to say that, direct them to hire. There's a difference between planning of your needs and directing you to fulfill them. Well, the first step is to find out what their needs are, and why their staff, as it's currently constituted, has made it impossible for them to comply with the performance measures in the stipulation. So I agree with you. But, but you see, that's the problem. They don't want to go the first step because it leads to the second step. Right. So your argument is that if you're only developing a plan which you need, it doesn't direct you to actually hire people. Right, and the district court has interpreted the language in the stipulation as a complete prohibition against hiring more staff. Yeah. We don't think that's true. We think he can say, come up with a plan. Let me, let me show me why the numbers of people you have are adequate or inadequate to... You don't even need a plan. You could get, what are the numbers that you need to adequately do this? That's correct too, Your Honor. That's correct too, but that's not what the district court thought he had the authority to do. I understand. And we, we disagree with that part of the district court's order. Yeah. To answer Judge Callahan, to answer your second question, our fallback position is that if in fact you had interpreted the court's order as the district court did, which we think is wrong, we made a motion, we made a motion to modify the language in this, in the stipulation so that it allows the district court to take measures that it has found necessary to achieve compliance with the performance measures. Well, I guess how to, just maybe you can help me out here. Maybe I'm, maybe this is just my own not understanding the practical. When you make a motion to modify on that, much like, say like a, people settle a civil case for $400,000 and then they make a motion to modify it to $500,000 because it wasn't enough, how do you do, how do you change the, you know, how can you change the terms of what the conditions are, unless someone agrees to it? Well, that's because this is a settlement agreement that has been, it's called a stipulation that has been, the court has retained jurisdiction to do everything it needs to do in order to remedy the constitution. Well, that's sort of the consent decree versus the stipulation argument. It's the same exact, it's not the same exact, it's very similar to this court's decision in Kelly v. Wengler, where there was a settlement agreement between the two parties. The district court found that the defendants of prison wasn't, weren't complying, actually it was a private corporation, weren't complying with the staffing requirements in that, for that settlement agreement. And then the court modified the agreement to allow, to extend jurisdiction because the, in addition to other remedies, in order to make sure that the defendants came into compliance with the settlement agreement, and the Ninth Circuit affirmed that order in Kelly v. Wengler. We're in the same position, and that's the, that's the authority that we're relying on. Okay, I understand your argument. Okay, thanks. Thank you very much. Thank you. Good morning, and may it please the court, I'm Amy Fetig, representing the plaintiff appellees in the subclass appeal. And I first want to clarify something that defense counsel stated, and that was that closed custody inmates definitively get out of their cell more than 22 hours a day. That is, that is not true. Indeed, that is the heart of what the district court found here, that defendants did not provide sufficient evidence. Indeed, they only provided one declaration. Well, what about the statutory construction, just in terms of maximum security, or there was listing in certain facilities? And what I'm understanding the government to say is closed custody people existed at the time that this stipulation was entered into. So why should we write into that closed custody is really maximum security and do that? I mean, we, you know, statutory construction, we presume that people say what they mean to say, and if it's plain, and if they leave things out, we can't say, oh, well, you meant to put, you actually meant to put closed custody in. No, indeed not. And the subclass definition here was very deliberately disjunctive. It was a subclass that would be kept in their cells 22 hours a day or more, or those individuals in the enumerated units. At the time the subclass definition was put together, everyone was defined as maximum custody in those units. And the reason it was disjunctive was there was concern that gamesmanship would happen, that either all the max custody, all the subclass individuals would be moved out of the units, or as defendants have suggested here, that they would be kept in their cells for 21 hours and 59 minutes a day in order to whittle down and destroy the subclass. And so there are those two components. And that's actually what the district court looked at here. He asked the defendants to provide Well, what if it was 19 hours? That's close to 22. So how do you, if you're going to line up 22 hours or more, what's wrong with line drawing at 21 hours and 59 minutes? I mean, we have to draw a line somewhere. Indeed, that's true. And here the district court tried to draw a line. And he asked the defendants to provide evidence that those, the people they were now claiming were closed custody and therefore not part of the subclass, even though they were in the enumerated units. He asked them to provide evidence both that they were no longer in the enumerated units and also that their conditions were substantially different. And what defendants provided to the court was one declaration about one facility. And in that declaration, what the court said he found, and indeed what is there, is merely a laundry list of hypothetical out-of-cell time. That evidence didn't tell him what anyone who was in those units was actually experiencing. And so his ruling, what it did was basically maintain the status quo with the narrow exception of those people in the jobs program. And so that's why what the court did here was merely interpret the subclass. That's why there is no jurisdiction to hear this appeal. Merely an interpretation of the subclass. That's what we're looking at here. Maintain the status quo. And in fact, defendants don't have to do more under this order. They do a little bit less. I didn't quite understand that argument. That was like, you know, this really helps. If you're helping them out so much, I don't know why they're opposing it. So I didn't quite understand your argument that this is so much better for them, but they just don't understand that. Explain that to me. Indeed. Well, what the district court did was maintain the subclass definition intact. So defendants do the same thing that they have always done under the stipulation, with the exception that the district court said, look, the evidence you provided me about individuals, specific individuals, specific numbers of individuals, in fact about 278, who are in a jobs program, who get out of their cell and work for 20 hours a day, those people are now different. Those people can be excluded from the subclass. Everybody else, status quo. And so actually, now defendants have to monitor fewer people, because those that it can establish are in the jobs program are no longer part of the subclass. And that's why this order was so provisional. Well, so does the precedent then, if it were to stand us, then it mean that the district court then can just keep reviewing files of people and saying, okay, you're in the class now, or? Absolutely not, because the district court drew a line in its order, but what it did was quite provisional, and that's why there is no jurisdiction to hear this appeal. Because the district court said, okay, there are these people in the jobs program, and I'm convinced that they're no longer part of the subclass, but I want the parties to work together just to deal with some of the questions that this ruling raises. You have 21 days, come back to me with either a workable plan or tell me how I can help you. Instead, the defendants appealed, and the court had to reiterate to them, look, I still need information from you. In fact, in its order from February 6, the court said, you know, it might be that 19.5 hours is the better benchmark, and if the parties think that's the case, then come back and tell me. Instead, the defendants appealed this order, which is still provisional in nature, was not in any way final. And in fact, this Court has precedent on this very point. Jeff D.B. Kempthorne says if a court is simply interpreting a subclass, there is no jurisdiction because there is not a final order under 28 U.S.C. 1291. Further, this Court has precedent about ordering parties to come up with a plan and get back to it. That's in VALA v. Idaho State Board of Corrections, where the court found, again, these are not final orders. They are not rightfully appealed. So would their argument then be, I'm just trying to, their argument for jurisdiction is that the court did more than just come up, you know, obviously, I think the two sides are, however many sides we have here, are in a position that if you come to some other agreement, you can amend the stipulation, and the court couldn't stop you from doing that, right? But the court can be frustrated with the sides not doing that, and then the issue is more what we have here, is what can the court do in interpreting the stipulation? And I'm seeing, I think their argument is that the court's changing the stipulation, not, and using that sort of as a hammer, but they never agreed to it in the first place. Well, what they did was unilaterally try to modify the stipulation, and the court said, give me evidence that the subclass indeed can be modified, and the evidence they provided was insufficient. It only supported the status quo, with a very narrow exception, and that's what the court ruled on. Well, when they say they modified it, are you saying that they moved people out of maximum security into, what do we call the other one? Closed security? No, what they did... I mean, the prisons, I think, fairly undoubtedly can move people around in the prisons, and how they choose to do that. Absolutely, but what they did, actually, the source of this entire dispute is they refused to provide two prisoner records under the terms of the stipulation. This is at heart a discovery dispute, and it's about defendants failing to comply with the stipulation. Well, I don't really like to hear that, that it's like we have to decide legal issues because something is at heart something, it's like, really, like, this is all, this all came about, we're all in court because someone was mean to me, or, you know, it's, I mean, we have to decide the issues, but what you're saying is the issue isn't the issue? The issue started with a discovery dispute over two prisoner orders, and that's why... Because they were in closed custody as opposed to in maximum security? Well, they were in the subclass units, actually, and so under the terms of the stipulation, those records should have been made available to plaintiffs, but defendants refused to produce them, claiming that they were now not part of the subclass, even though they were housed in the enumerated units. This was a great surprise to us, but it goes to the provisional nature and case management of these orders at heart, because it was a discovery dispute. And this Court has actually looked at that issue in Plata v. Brown and said case management orders, discovery orders, don't have appellate jurisdiction under Section 1291. They're not final, even in a post-judgment context, because the concern here is opening up the floodgates to piecemeal appeals that really, at the heart, concern case management... Now, that subclass solved your discovery dispute? That subclass ruling solved your discovery dispute? Indeed, it should have done, although the records actually were never produced. Okay. Thank you, Counsel. Thank you, Your Honor. Your rebuttal. Judge Callahan, you're correct that this Court's only job is to determine whether the District Court can order the remedy, the outside transport order in Appeal No. 1 or not. Under the stipulation, the ADC cannot be held noncompliant if it's less than 100 percent. That much is very clear from the plain language. But under the Court's order, we can be. If we're between 80 and 100 percent, if we're at 99.9 percent, we can be held noncompliant because this order requires us to be 100 percent compliant. So I agree. Let's look at the stipulation and see whether or not the District Court interpreted that... But you're under 80 anyway, right? Well, on some performance measures we are. And that's when the judge came in and said not only do you have to get it back to 80, but you've got to get it all the way up to 100 percent under the terms of its order. Under the terms of the stipulation, I think both parties agree, well, it's our position that if we're 99 percent compliant, that the Court cannot hold us or find that we are noncompliant. Right. I mean, it's triggered by the threshold level. But the District Court said, look, you have to be 100 percent compliant, but I don't have the power to intervene unless we hit these lesser threshold levels. Right. And it can intervene once it's below 80 percent. But then what the order does is it then affirmatively... I understand your argument. Yeah. On the PLRA certification question, the order regarding settlement, it only finds that the relief complies with the PLRA. It does not find that there was a constitutional violation. So what do we do with the stipulation? Well, the parties can agree to whatever they want. I mean, the stipulation, you just leave it as it is. The question is, what do you do with the order? The order was improperly compliant, and because it's not, because there was no constitutional violation finding, that order has to be vacated. Did you agree to that order, though? It was a proposed order, yeah, that we agreed that we would submit the order to the Court. But... But then I guess what isn't inherent to that, the fact that you agreed to it, that there was a constitutional violation. No. No. It's just... Well, then how does it comply with the PLRA? Well, there's some ambiguity whether or not settlement agreements like this that... So maybe you made a bad stipulation there. Well, let's assume that that's true. That's not a reason to imply a constitutional violation. And if you look at Pettyman, on the other hand, if you, in fact, stipulated to the constitutional violation and compliance with the PLRA, it's hard for you to appeal from that. That's invited error, basically. Well, I go back to we didn't stipulate to a constitutional violation. I think it's paragraph 7 says that the interpretation shall not be construed as a finding of liability by any party. That was an agreed-upon provision. Well, I'm... Right. And then the... But we're talking jurisdiction, and you agreed to the jurisdictional foundation. Right? We agreed to allow the district court to retain authority to enforce. And then the provision that says for the court to enter this order, it said just that, that we agreed that the court will enter this order. Still, there's no underlying constitutional violation. The court shouldn't imply one. Appeal number 2, the plaintiffs just admitted that what they had wanted all along was an order to increase staffing. Could you give me the number, just number 2? Sure. What is the number of the appeal? Appeal number 2 is 17-15302. Well, as to the staffing appeal, why couldn't the district court enter a generic order about coming up with a plan for hiring? Well... Do you think that's part of its authority? If they had just asked for a staffing analysis, let's figure out the root of this problem. Perhaps that might have been okay. I mean, it would have been expending resources on that, but what are you going to do with that order? The purpose of issuing such an order is to find out, you know, you need to hire this many more people, this many more doctors or nurses in this facility here, you need to hire more people in this type here. That's the whole purpose of a staffing analysis, is to get that information. They didn't even ask for that. They didn't just ask for a staffing analysis. Below they wanted an order to increase staff. Now they're massaging it to say, well, we want a staffing analysis plus an order that orders ADC to implement a remediation plan that's informed by that analysis. So it's not just a staffing analysis. It's an analysis plus now then you also have to implement the results. That isn't the... The order doesn't say that. The order they want is just the analysis. You're arguing about what they're going to do next. Well, the district court ruled based on what they requested. It looked at what the request was below, which was an order to increase staff. And it said, look, I can't issue that order because... Because the magistrate judge decided that the stipulation didn't allow him to do it because you can't give an order to hire people. But this wasn't an order to hire people. I don't understand why the magistrate judge decided that this was an order to hire people, something he cannot give. There's nothing in that proposal that says you have to hire 150 people or et cetera. I think what the district court concluded was if I were to order you to increase staff and ADC came back and said, I'll hire one doctor at this facility. But that isn't what they're asking. They're asking to find out how many you need. The district court realizes, the magistrate judge realizes he can't in an order to say hire those people. But there's nothing in the stipulation that says, as I understand it, that they can't ask for a plan of getting the need. But that's not what they, that was not the genesis of the order. And if they want to go back and request such an order, they can. But the order before this court was rejecting their proposal to issue a general staffing order or an order to increase staff. That's what's before the court. If they want to go back... A general staffing order. There's nothing wrong with that, is there? Well, I... Order what your staff needs? Well, it's very vague. Finding out needs? General, general staffing increases. That's a quote from what they had requested. General staffing increases. We move for an order that requires staffing increases. That's what was requested below. And that's, they're shifting now that, well, the court said we can't do anything. Well, that's not, that's not what the district court did. The district court looked at what the request was and said, I can't order that because it's going to violate the stipulation. And that's the only thing before this court. Whether or not the court can modify the stipulation to remove that no staffing provision, that argument's based on Rule 60b-6. The authority to modify is grounded in a court's authority to modify its own court orders. And either the stipulation or the order resettlement is a court order. It wasn't entered by the court. It was a private settlement agreement before the parties. And I understand that the parties allowed the district court to retain jurisdiction to enforce it. But it, it, that does not convert either the stip or the order into an order. It doesn't say ADC is ordered to do this. The order doesn't incorporate the terms of the stipulation. And because neither the stipulation or the order is a consent decree or a court order or have the judicial imprimatur of a court order, Rule 60b-6 is off the table. The court cannot modify it. The stipulation expressly precludes the district court from, from modifying it. So what do you think the district court can do with respect to staffing? What is it permitted to do under the order and stipulation? Well, perhaps, perhaps a generic staffing analysis. All right. So, I mean, you, you, you, you, you, and I, again, this is not before you saw it. I'm not taking a concession. I just kind of want to get an idea of what, what your position is. So a general, the court could say, would you prepare a staffing analysis? Please prepare a staffing analysis. It actually has, in fact, just ordered something similar to that. Could it say, I would like a staffing plan without being specific? Well, I don't think we would know what, what that means. We can only, I mean, if we don't have a plan on it. Well, if the staffing plan is how, how many people do you propose to hire or something like that? And you would, I think, take umbrage with that. Right. Because what would be the point in providing, conducting analysis that says we, you know. But if you said something like, okay, here's where we're down, here's where, you know, this is what we need to do, you know, this, that, and the other, then another lawsuit could be brought, is that correct? And then say the prisons are not, you know, it, which would be separate from, it's not a question of the stipulation, then the prisons aren't doing their jobs. That's what causes stipulation in the first place, right? Right. Right. But they still could bring another lawsuit, correct? Well, I, that's an interesting question. And, and let me just back up. When I, I'm not agreeing that we entered into the stipulation because of. Well, that stipulation can't cover the rest of prison's incarceration for the rest of the century. Well, I, I suppose not. I suppose not. Oh, that seems pretty clear. I mean. I won't, I won't disagree with that. But getting back to whether or just a, you know, whether a staffing analysis can be, can be ordered, hypothetically, I mean, we can, we can discuss that, but it's, it's really not. Wait a minute. I, I, I'm sorry. No, go ahead. You're indicating that you think there's no reason for this other than to get him next to direct you to hire them. But that's not necessarily so. It can be used as a, as a measure to make changes. It could be used to develop community views so that people can vote for the next member of the board of whatever it is. There's other uses for this other than what you indicate. So if it, it doesn't necessarily result in an order that you direct one, you must hire a hundred people, then isn't it within the stipulation? I, I don't, I think the district judge may have mistakenly believed or didn't think through the interpretation the magistrate judge gave to that. I would invite you just to go back to their briefing below and, and look at exactly how they phrased it and what they requested. That may be so, but what we're referring to here now is what, what the magistrate judge ordered and the magistrate ordered says, I can't do anything like a staffing plan under the stipulation. I, I don't think that's right. I, at least I would be doubtful that it is because it does not direct him to hire anybody. It only directs that there be a plan developed. Maybe the, the judge's order was a little bit broader than what the relief request was, but there, the judge issues orders every single day in this case. They're usually, they can be anywhere from one or two or three pages, so maybe it was just a matter of brevity in, in the way that he issued the order and, and what he was saying. It may be, but all we have is what he wrote. And we also have what plaintiffs requested, and I'd ask the Court to go back to that, and that's what should control this. Whether or not the judge can do anything else, I don't think is relevant to this appeal. And you're saying the plaintiff's request was? Yeah. They, plaintiffs formally move for an order that requires staffing increases. That's SCR 7. On SCR 4 to 5 and 7 and 8, they requested, quote, general staffing increases. But I think the point Judge Wallace is making is that may be what they requested, but he answered a broader question that would seem to prohibit any action with respect to staffing. And I, I tend to agree that that's not, that's not right. And, and perhaps, perhaps there's, you can thread that needle a little bit. Maybe there's something else. But what plaintiffs would have to do is go back to the district court and try to figure that out and request something different. Okay. Your time has expired. Do you want any questions on the subclass appeal before we? Okay. I think we have that in hand. Yeah. Do you have any response to the subclass? That argument was somewhat persuasive to me, and I'd like to hear your response to what counsel. Sure. Was there any particular aspect of the argument? Well, this is really a discovery dispute? Well, it, it's, it did start out as a discovery dispute, whether or not we had to turn over files of two inmates who were closed custody inmates. And that, that admittedly would be a discovery dispute. But the, the judge took another step, an additional step, and said, you, you have to turn over those files because I'm considering closed custody subclass members, and because you now have to monitor closed custody inmates' compliance with the stipulation. That's what takes it out of the discovery dispute realm, because the order is that we must now, we must now monitor these closed custody inmates. And that was something that it ordered in its Rule 60 order. It went above and beyond just merely defining who is and is not in the, in the closed, the, the subclass. It then said, not only are they part of the subclass, but you have to provide performance measures to them, which is something that we hadn't done before because it wasn't, it's not in the stipulation. The stipulation, at least 54 times, refers only to max custody inmates, maximum custody inmates, not closed custody inmates. They had brought up, they, they had mentioned that, that the purpose of the subclass, the enumerated units provision was to avoid gamesmanship. That's just simply not true. The subclass definition was created by the district court when it certified the, the, the class years ago. And then it, it was just imported from that order and placed in this, into the stipulation. It was, we did not create a new subclass for purpose of the stipulation. It's something that the district court had found all along. Would you agree that the effect of the district court order was to reduce the, the subclass? I think it, I think it, it increases the effect. I think it, I believe, I, I forget who brought up this point, but it was a very good one. Close custody inmates who, before this order, had more out of cell time. If this order stands, we now have to conform them to max custody inmates and monitor them and, and only apply the performance measures to them, which would result in less out of time. I thought the import of the district court order was these, these inmates are, are spending time out of their cells. So, so they're not part of the class. Their argument seems to be the class was initially set at 22 hours of confinement. And at that point the, that was synonymous with max prisoners. But now we have other prisoners who fit the 22 hours and the intent was to hit all prisoners who were in isolation for 22 hours. Well. So, I mean, that's kind of an interpretation question, isn't it? But, right. But, but they're not, close custody are not now 22 hours or more. They're offered much more out of cell time and it's been like that. Nothing has changed. There was always a separate classification that they were, they were offered and eligible for more out of cell time than the max custody inmates. Nothing has changed since the situation. So it's not an evidentiary question for the, for the district court, not necessarily an I mean, basically you're saying, definitionally, close custody inmates cannot form part of this class. That's correct. And that's your argument. And they're saying, well, actually they do in some instances. So isn't that just an evidentiary matter to sort out? I mean, let, let me put it this way. If they're, it's sort of like a Venn diagram. If there are close custody prisoners who actually are in there more than 22 hours, do you think they're in the subclass or not? A close custody inmate who's in their cell for more than 22 hours? Right. No. Because they're offered, by definition, more than 22 hours, to be out of their cell more than 22 hours. We, we can't force inmates out of their cell. They can refuse to come out for rec or for, to shower or to eat. And some inmates do that. But that, they, that would give the inmates the, the power to conduct these sit-ins so that they are part of the max custody class and part, and, and the stipulation does apply to them. I don't know why they would do that, but that's why this is not an evidentiary issue. It is a, it is a, an interpretation issue. They're offered less, they're offered more time and, and that's the end of the inquiry. Thank you, Counsel. The case just heard will be submitted for decision and will be in recess
judges: Wallace, Thomas, Callahan